UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ALBERT BRUNO AND ALEX STRAHAN | CIVIL ACTION |
| VERSUS | |
| BRAD SCHAEFFER, ET AL. | NO.: 16-00001-BAJ-EWD |

RULING AND ORDER

Before the Court are the **Motions to Dismiss (Doc. 35 and 39)** filed by Defendants Alpha Labs, L.L.C., Beta Labs, L.L.C., Gamma Labs, L.L.C., MedComp Laboratory Sciences, L.L.C., MedComp Sciences, L.L.C., Brad Schaeffer, Sigma Labs, L.L.C., Javid Janani, Lisa Janani, and Quantum Laboratories, L.L.C. Plaintiff-Relators Albert Bruno and Alex Strahan filed oppositions, (Docs. 45 and 48), and Defendants filed replies. (Docs. 51 and 52). For the following reasons, the **Motions to Dismiss (Doc. 35 and 39)** are **GRANTED IN PART** and **DENIED IN PART**.

I.  BACKGROUND

Plaintiff-Relators, two former employees of a large medical laboratory called MedComp Laboratory Sciences, L.L.C. and MedComp Sciences, L.L.C ("MedComp") allege that Defendants conspired to defraud the United States out of millions of dollars arising from fraudulent Medicare and Medicaid claims. (Doc. 1 at ¶ 2). Relators allege that Defendants offered physicians ownership interests in labs called Physician Owned Labs ("POL"), which existed in name only, and they received

1

payments from the labs in proportion to the number of urine specimens the physicians sent to a different lab called Quantum for urine testing covered by private insurance. *Id.* at ¶ 3. Relators also allege that the scheme incentivized the same doctors to send their urine specimens covered by Medicare and Medicaid to another lab called MedComp. *Id.* at ¶ 109.

Relators allege that the scheme began in early 2013, when Brad Schaeffer, the owner of MedComp, called a companywide meeting for Quantum and MedComp to present the POL model. *Id.* at ¶ 23, 60. Schaeffer allegedly instructed MedComp's sales representatives to promote the POL model to doctors to induce them to send urine specimens covered by private insurance to Quantum and urine specimens covered by Medicare and Medicaid to MedComp. *Id.* at ¶ 60. Relators allege that Brad Schaeffer, Lisa Janani, and Javid Janani formed entities called Alpha, Beta, Gamma, and Sigma as POLs. *Id.* at ¶ 62. Relators, however, allege that these labs existed in name only and did not physically exist, and were not licensed labs. *Id.* at ¶ 62.

Relators allege that when participating physicians referred specimens to the POLs, the POLs would bill Quantum for urine tests, and then Quantum would pay the POLs for the tests. *Id.* at ¶ 74. The revenue paid to the physicians was proportionate to the amount of specimens they sent to Quantum. *Id.* MedComp allegedly only allowed physicians who were willing to send specimens to Quantum to buy shares in the POLs. *Id.* at ¶ 77. Relators also allege that Schaeffer instructed MedComp's sales representatives to encourage the physicians to send their Medicare

and Medicaid specimens to MedComp because Quantum and MedComp, through the POLs, were providing the physicians with a financial incentive to do so. *Id.* at ¶ 77. As of December of 2014, all physicians who sent specimens to Quantum for private insurance reimbursements also sent specimens covered by Medicare and Medcaid to MedComp. *Id.* at ¶ 79.

In early 2014, Relator Albert Bruno, a Medcomp sales manager, allegedly presented a subscription agreement for a POL to a physician, but after the physician's attorney concluded that the POL model was not legal, the physician did not invest in the POL. *Id.* at ¶ 93. Relator Bruno then raised the legality of the POL program to Brad Schaeffer, an owner of MedComp because Bruno was concerned the program violated statues prohibiting self-referral schemes. *Id.* at ¶ 94. Rather than responding to Bruno's concerns, Schaeffer allegedly labeled Bruno a "trouble maker" who needed to be controlled. *Id.* at ¶ 95. As of December 2014, about sixty-one doctors in seven states had ownership interests in the POLs. *Id.* ¶ 107. Relators also allege that the POL model encouraged doctors to act based on financial gain and not patients' best interest. *Id.* at ¶ 116.

In total, Relators claim that between April 2013 and November 2014, over 15,000 urine specimens were sent to Quantum from doctors participating in the POL scheme. *Id.* at ¶ 118. According to Relators, between April 2012 and January 2016, private insurance companies paid Quantum $12 million for urine tests and from April 2013 through December 2014 MedComp has been paid $46 million. *Id.* at ¶ 119-120. Relators further claim that between April 2013 and January 2016, Medicare and

Medicaid paid MedComp $18 million for specimens originating from doctors participating in the POL scheme. *Id.* at ¶ 121.

Relators claim that Defendants violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1)(A)-(C) by presenting false claims to the United States, making false records, and conspiring to violate the FCA. *Id.* at ¶ 122-140. Relators also claim that Defendants violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Stark Law, 42 U.S.C. § 1395nn, and the Louisiana Anti-Kickback Statute, La. R.S. § 37:1745. *Id.* The United States declined to intervene. (Doc. 53).

## II.  LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss, the plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Additionally, motions to dismiss under Rule 12(b)(6) test the sufficiency of the complaint against the backdrop set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

Further, "facial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Hence, the complaint need not set out "detailed factual allegations," but something "more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555. When conducting its inquiry, the Court "accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

Claims brought under the FCA are fraud claims subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *U.S. ex rel. Longhi v. Lithium Power Techs, Inc.*, 575 F.3d 458, 468 (5th Cir. 2009). Rule 9(b) requires, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

## III. DISCUSSION

### A. Presentment of False Claims under § 3729(a)(1)(A)

Relators claim that Defendants made false Medicare and Medicaid claims. (Doc. 1 at ¶ 124). The FCA imposes civil liability and treble damages on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A); *see also United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010). There are therefore three basic elements of an FCA violation: (1) the claimant presented or caused to be presented a claim for payment to the United

States; (2) the claim was false or fraudulent; and (3) the claimant knew the claim was false or fraudulent.[1]

### a. Presented or Caused a Claim to be Presented

Under the first element of an FCA claim, a relator must allege that a defendant presented or caused a claim to be presented to the United States. 31 U.S.C. § 3729(a)(1)(A). An "FCA claim[] can be either legally false or factually false." *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 373 (5th Cir. 2016). "A claim is factually false when the information provided to the government for reimbursement is inaccurate." *Id.* For example, the traditional false claim occurs when a doctor bills Medicare or Medicaid for services that were not actually performed. A claim is legally false when "a claimant . . . falsely certifies compliance with [a] statute or regulation.'" *Id.* (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)).

Here, Relators claim that Defendants made legally false Medicare and Medicaid claims by falsely certifying compliance with the Anti-Kickback Statute and Stark Law. (Doc. 1 at ¶ 127). It is well-established that falsely certifying compliance with the Stark Law or the Anti-Kickback Statute constitutes a false claim. *United States ex rel. Thompson*, 125 F.3d at 902.

Defendants argue that Relators fail to adequately allege that they presented claims to the government because Relators do not identify any claims by "date, time,

---

[1] Liability also requires materiality. *U.S. ex rel. Longhi*, 575 F.3d at 469. Defendants, however, do not argue that Relators fail to allege materiality, and therefore the Court will not address this issue. (*See* Doc. 35-1 and 39-1).

place, or service provided." (Doc. 35-1 at p. 6). Defendants therefore contend that Relators fail to satisfy Rule 9(b)'s heightened pleading standard. *Id.* at p. 7. The United States Court of Appeals for the Fifth Circuit, however, has held that under Rule 9(b) a relator "does not necessarily need [to plead] the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted" because this "level of proof [is] not demanded to win at trial[.]" *Grubbs v. Kanneganti*, 565 F.3d 180, 189-90 (5th Cir. 2009). Instead, a relator may survive a motion to dismiss by alleging "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

Here, Relators plead facts establishing that Defendants participated in a scheme where doctors referred urine specimens to labs that the same doctors owned, and the doctors were paid in proportion to the number of referrals they made. (Doc. 1 at ¶ 88). To be sure, Relators do not plead the exact amounts, billing numbers, or dates of allegedly fraudulent bills. But Relators allege sufficient facts for the Court to make the strong inference that the claims were submitted to the government because Relators allege that doctors were encouraged to send urine specimens covered by Medicare and Medicaid, (Doc. 1 at ¶ 112), and that Defendant MedComp has been paid about $18 million for testing specimens covered by Medicare and Medicaid since 2013. *Id.* at ¶ 121.

### b. False or Fraudulent Claim

Under the second element of an FCA claim, a relator must allege that a defendant made a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A). Relators claim that Defendants made false and fraudulent claims by falsely certifying that their claims did not violate the Anti-Kickback Statute and the Stark Law. (Doc. 1 at ¶ 127). As the Court already discussed, falsely certifying compliance with the Stark Law or the Anti-Kickback Statute constitutes a "false claim" under the FCA. *United States ex rel. Thompson*, 125 F.3d at 902. The Court will therefore address in turn whether Relators sufficiently allege that Defendants violated the Stark Law or the Anti-Kickback Statute.

#### i. Stark Law

The Court will begin with the Stark Law. "The Stark Law was enacted to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial interest." *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012). The Stark Law prohibits physicians from referring Medicare patients to an entity for certain "designated health services" if the referring physician has a nonexempt "financial relationship" with such entity. 42 U.S.C. § 1395nn(a). Clinical laboratory services, like urine tests, are "designated health services." *See* § 1395nn(h)(6)(A).

A physician has a "financial relationship" with an entity if the physician has "an ownership or investment interest in the entity" or a "compensation arrangement" with the entity. § 1395nn(a)(2). A "compensation arrangement" includes "any

arrangement involving any remuneration between a physician" and an entity. § 1395nn(h)(1)(A). And "remuneration" "includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." § 1395nn(h)(1)(B).

Defendants argue that Relators fail to allege a Stark Law violation because Relators do not allege that the physicians who invested in the POLs had a financial relationship with a lab to which they were referring Medicare and Medicaid patients—namely MedComp. (Doc. 35-1 at p. 12-13). Rather, Defendants argue that because Quantum only sought reimbursement from private insurers, Defendants did not violate the Stark Laws. (Docs. 35-1 at p. 13 and 39-1 at p. 10). Relators argue that there is a financial relationship between the POLs and MedComp because POL physicians were encouraged to send their Medicare and Medicaid specimens to MedComp because of the financial benefits available to them for sending specimens to Quantum. (Doc. 45 at p. 10).

The Court concludes that Relators adequately allege an indirect compensation arrangement between physicians who invested in the POLs and MedComp, which submitted Medicare claims. The Stark Law implementing regulations are particularly helpful in defining indirect compensation arrangements. They provide that a financial relationship constitutes a prohibited "indirect compensation arrangement," if (1) "there exists an unbroken chain of any number . . . of persons or entities that have financial relationships . . . between them," (2) "[t]he referring physician . . . receives aggregate compensation . . . that varies with, or takes into account, the volume or value of referrals or other business generated by the referring

9

physician for the entity furnishing" the designated health services, and (3) the entity has knowledge that the compensation so varies. 42 C.F.R. § 411.354(c)(2); *see also Drakeford*, 675 F.3d at 408.

First, there is an unbroken chain of persons with financial relationships because Relators allege that the POLs were formed by entities owned by Defendants Brad Schaeffer, Javid Janani, and Lisa Janani. (Doc. 1 at ¶ 62). Relators also allege that Brad Schaeffer owned MedComp, Javid Janani owned MedComp, and Lisa Janani owned Quantum. *Id.* at 23-25. Second, Relators allege that the referring physicians received compensation based on the volume of referrals because physicians were paid in proportion to the number of urine specimens they sent to Quantum. *Id.* at ¶ 74. Third, Relators allege that the entity furnishing the designated health services—Quantum—had knowledge of the compensation scheme. Relators allege that MedComp's sales directors told Bruno not to disclose that MedComp linked referred specimens to payouts because it was illegal. *Id.* at ¶ 98. Relators have thus alleged a Stark Law violation.

### ii. Anti-Kickback Statute

The Court next turns to the Anti-Kickback Statute, which prohibits:

> knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a–7b(b)(2)(A). In other words, it "prohibits offering money or other things of value to entice another party to provide a good or service that would be paid

for by a federal health care program." *United States ex rel King v. Solvay Pharm., Inc.*, 871 F.3d 318, 331 (5th Cir. 2017). The statute has been broadly interpreted to cover any arrangement where one purpose of the remuneration is to obtain money for the referral of services or to induce future referrals. *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). Defendants argue that Relators anti-kickback allegations are conclusory and fail to meet Rule 9(b)'s heightened pleading standard because Relators do not allege that any specific physician who purchased an interest in a POL referred urine samples to MedComp and received compensation. (Doc. 35-1 at p. 11 and 39-1 at p. 11).

Pleading fraud with particularity, generally requires a plaintiff to allege the "who, what, when, where, and how" of the fraud. *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013). For FCA claims, however, the Fifth Circuit has "explained that Rule 9(b) is 'context specific and flexible,' and noted that a plaintiff may sufficiently state a claim with particularity 'without including all the details of any single court-articulated standard—it depends on the elements of the claim in hand.'" *Id.* (quoting *Grubbs*, 565 F.3d at 189–90). Defendants rely on *Nunnally*, in which the Fifth Circuit held that the relator had not sufficiently plead an FCA claim because he failed to allege the content of the financial arrangements at issue, the inducements, improper referrals, the identity of any physicians, or the time period of the scheme beyond alleging that it occurred from 1993 to the present. *Id.* at 894. As a result, the Court held that the complaint was sweeping and conclusory. *Id.*

Here, unlike *Nunnally*, Relators allege fraud with particularity. First, Relators allege the content of the financial arrangement, the inducements, and the improper referrals with detail by alleging how the investments in the POLs operated, the cost of the investment, and the way that physicians were compensated in proportion to referrals. (*See* Doc. 1 at ¶ 62-83). And although Relators do not allege the participating physicians by name, they sufficiently allege the identity of the physicians by claiming that about sixty-one physicians or physician groups from Louisiana, Tennessee, Mississippi, Illinois, Arizona, Alabama, and Georgia had an ownership interest in the POLs. (Doc. 1 at ¶ 107). Relators also allege the time-period of the alleged scheme by alleging that it began in early 2013, that the POLs were formed in 2013 and 2014, and that since April 2013 MedComp had been paid about $18 million for testing specimens covered by Medicare and Medicaid for specimens originating from physicians participating in the POLs. *Id.* at ¶ 60, 62, 121. Relators complaint is far from conclusory, and it meets Rule 9(b)'s pleading standard for the Anti-Kickback Statute claim.

Defendants also argue that although Relators allege that physicians received payouts from the POLs based on their referrals to Quantum for private insurance patients, Relators fail to allege that Quantum provided physicians a financial incentive to refer Medicare and Medicaid specimens to MedComp. (Doc. 39-1 at p. 14 and 35-1 at p. 11). The Court disagrees. It is not dispositive that Quantum processed private insurance and MedComp processed Medicaid and Medicaid. Compensation for private insurance referrals may constitute a payment to induce referrals of federal

health care program business if there is a nexus between the kickbacks for private insurance and Medicare or Medicaid business. Neither party cites any case that addresses this issue, nor is the Court aware of any. However, the Court is persuaded that carving-out referrals of federal health care programs can violate the Anti-Kickback Statute by disguising remuneration for federal health care program referrals.

The Office of the Inspector General of the Department of Health and Human Services ("OIG") has interpreted the Anti-Kickback Statute in advisory opinions to mean that carving out federal health care business from commercial referrals may violate the Anti-Kickback Statute. *See* OIG Advisory Op. No. 13-03, at 5 (June 7, 2013), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2013/AdvOpn13-03.pdf; OIG Advisory Op. No. 11-08, at 5 (June 14, 2011), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-08.pdf; OIG Advisory Op. No. 06-02, at 7 (Mar. 21, 2006), available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2006/ao0602.pdf; *see also* Russell Caldwell Ramzel, *Examining Covert Kickbacks: The OIG Carve-Out Rule*, 11 J. Health & Life Sci. L. 1, 8 (2017). Although the Court does not defer to OIG's interpretation, the Court finds OIG's reasoning persuasive. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (concluding OIG advisory opinions do not establish rules of decision, and are not to receive judicial deference).

For example, in an advisory opinion, OIG addressed a scenario where a laboratory would create a management company to help support physicians set up

laboratories that would only provide services to commercial patients by providing facility space and other support. *See* OIG Advisory Op. No. 13-03. Even though these new laboratories would not provide services to Medicare and Medicaid patients, OIG concluded that the arrangement may violate the Anti-Kickback Statute because the parent laboratory processed Medicare and Medicaid patients. *Id.* at p. 5. OIG reasoned that the arrangement may "increase the likelihood that physicians will order services from the Parent Laboratory for Federal health care program beneficiaries . . . for reasons of convenience, to demonstrate commitment to the Parent Laboratory and potentially secure more favorable pricing on private pay services, or simply because the Physician Groups fail to make a distinction between the Parent Laboratory and the laboratories operated with support from the Parent Laboratory-owned Management Company." *Id.*

Here, the Court finds that it is reasonable to infer that the POL scheme will likewise increase the chances that physicians refer urine specimens to MedComp, which takes Medicare and Medicaid even though physicians only receive payments proportionate to Quantum referrals for private insurance. MedComp and Quantum share similar owners with the POLs, and most importantly, Relators allege that Brad Schaeffer instructed MedComp's sales representatives to offer the POL model to physicians. (Doc. 1 at ¶ 65). As a result, it is plausible that physicians view MedComp and Quantum as related entities, and physicians will send urine specimens to MedComp because they receive remunerations for referrals to Quantum. The Anti-Kickback Statute "prohibits offering money or other things of value to entice another

party to provide a good or service that would be paid for by a federal health care program." *United States ex rel King,* 871 F.3d at 331. The Court concludes that at this early stage, Relators have plead sufficient facts to conclude that the POL scheme enticed physicians to refer urine specimens to Quantum.

    c.    **Scienter**

Under the third element of an FCA claim, a relator must allege that a Defendant acted with the requisite scienter. 31 U.S.C. § 3729(a)(1)(A). Under the FCA, "liability does not attach unless 'the [defendant] knowingly asks the Government to pay amounts it does not owe." *U.S., ex rel. Johnson v. Kaner Med. Grp.,* 641 F. App'x 391, 394 (5th Cir. 2016) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.,* 336 F.3d 375, 381 (5th Cir. 2003)). Knowingly means that a person acts with actual knowledge, deliberate ignorance, or reckless disregard for the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A)-(B).

The Court finds that Relators have plead sufficient facts to meet the FCA's scienter requirements. Relators allege that the POLs were formed by entities owned by Brad Schaeffer, Javid Janani, and Lisa Janani. (Doc. 1 at ¶ 62). Relators also allege that Schaeffer and Javid Janani owned MedComp, and Lisa Janani owned Quantum. *Id.* at ¶ 23-25. Relators also allege that they raised concerns about the legality of the scheme to Schaeffer, and Schaeffer than attempted to avoid bringing scrutiny to the POL scheme. *Id.* at ¶ 92-106. Specifically, Relators allege that Relator Bruno sent "several emails to his supervisors, including Defendant Schaeffer, asking direct questions about the configuration and legality of the Subscription Agreement,

15

but those emails went unanswered." *Id.* at ¶ 94. Based on these allegations, it is plausible that Defendants had actual knowledge or at least acted with reckless disregard. Relators therefore have sufficiently pled the scienter requirement of an FCA claim.

### B. False Record Under § 3729(a)(1)(B)

Relators next allege that Defendants violated § 3729(a)(1)(B), which imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Like Relators presentment of false claims allegations, Defendants argue that Relators fail to sufficiently allege the certifications that were made, who submitted them, and when they were made. (Doc. 35-1 at p. 15). Lisa and Javid Janani also argue that Relators fail to allege that either of them made or participated in making false records. (Doc. 39-1 at p. 7). For the same reasons the Court has already discussed *supra*, Relators have adequately alleged that Defendants made a false certification and that all Defendants made or participated in making false records. Relators therefore sufficiently allege a false record claim.

### C. Conspiracy to Violate the FCA Under § 3729(a)(1)(C)

Relators next claim that Defendants violated the FCA's conspiracy provision. (Doc. 1 at ¶ 129). "Section 3729(a)(3) subjects to civil liability any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." *Grubbs*, 565 F.3d at 193 (internal quotations omitted). Conspiracy requires "(1) the existence of an unlawful agreement between defendants to get a false or

fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *Id.* (quoting *United States ex rel. Farmer v. City of Houston*, 523 F. 3d 333, 343 (5th Cir. 2008)). "[A] plaintiff alleging a conspiracy to commit fraud must "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy." *Id.* (quoting *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008). A court may, however, infer that defendants entered an agreement from a relator's allegations. *Id.* at 194.

Defendants argue that Relators failed to plead a substantive violation of the FCA, and therefore the conspiracy claim fails. (Doc. 35-1 at p. 16 and 39-1 at p. 12). The Court, though, has already concluded otherwise. Defendants also argue that the conspiracy allegations are conclusory. (Doc. 39-1 at p. 12). The Court disagrees. First, Relators have alleged sufficient facts from which the Court can infer that the Defendants agreed to commit fraud under the FCA. Indeed, Relators allege that between May 6, 2013 and August 8, 2014, Brad Schaeffer and Javid Janani, as well as entities associated with Brad Schaeffer, Javid Janani and Lisa Janani, formed the POLs, which were front entities used to compensate physicians who sent urine samples covered by private insurance to Quantum. (Doc. 1 at ¶ 62-63). Brad Schaeffer also owns MedComp, and Lisa Janani owns Quantum. *Id.* at ¶ 23, 25. Based on these allegations, it is reasonable to infer that the Defendants entered an agreement to create the POL scheme. Relators have also alleged that numerous act were performed in furtherance of the conspiracy. For example, Relators allege that

MedComp asked Relator Bruno to promote the POL model in Pennsylvania. *Id.* at ¶ 89. Relators therefore state a claim for conspiracy to violate the FCA.

D.  **Anti-Kickback Statute**

Relators claim that Defendants are directly liable under the Anti-Kickback Statute. (Doc. 1 at ¶ 132-134). As already discussed, a relator can bring an FCA claim based on a violation of the Anti-Kickback Statute. But the Anti-Kickback Statute itself is a criminal statute, *see* 42 U.S.C. § 1320(a)-7b, and it does not provide for a private right of action. *See United States ex rel King*, 871 F.3d at 324 n.1 (quoting *United States ex rel. Ruscher*, at 663 Fed. App'x. at 371 n.2). Relators Anti-Kickback Statute claim is therefore dismissed.

E.  **Stark Law**

Relators also claim that Defendants are liable under the Stark Law. (Doc. 1 at ¶ 135-137). Like the Anti-Kickback Statute, the Stark Law does not create a private right of action. *See U.S. ex rel. Drakeford*, 675 F.3d at 396; *United States ex rel. Okeeffe v. River Oaks Mgmt. Co.*, LLC, No. 16-CV-48, 2017 WL 4685001, at *2 (S.D. Miss. Oct. 18, 2017). Relators Stark Law claim is therefore dismissed.

F.  **Louisiana Anti-Kickback Statute**

Finally, Relators claim that Defendants violated Louisiana's Anti-Kickback Statute. (Doc. 1 at ¶ 138-140). The Act provides that "[n]o health care provider shall offer, make, solicit, or receive payment, directly or indirectly, overtly or covertly, in cash or in-kind, for referring or soliciting patients." La. R.S. 37:1745(B). Louisiana's Anti-Kickback Statute, unlike the Federal Anti-Kickback Statute also requires that

health care providers be licensed by the State of Louisiana. *See* La. R.S. 37:1745(A)(2) (defining a health care provider as "a person, partnership, or corporation licensed by the state to provide health care or professional services . . .").

Here, Relators do not allege that any of the Defendants are licensed by Louisiana to provide health care or professional services. (*See* Doc. 1). Indeed, Relators allege that Defendants Alpha Labs, Beta Labs, Gamma Labs, and Sigma Labs are Louisiana limited liability companies "but they are not licensed laboratories[.]" (Doc. 1 at ¶ 22). *Id.* And Relators Complaint is silent about whether any other Defendant is a licensed health care provider in Louisiana. (*See* Doc. 1). Relators Louisiana's Anti-Kickback Statute claim is therefore dismissed.

IV. **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the **Motions to Dismiss (Docs. 35 and 39)** are **GRANTED IN PART** and **DENIED IN PART**. The Motions to Dismiss are **GRANTED** as to Relators Anti-Kickback Statute, Stark Law, and Louisiana Anti-Kickback claims, and **DENIED** as to Relators False Claims Act claims.

**IT IS FURTHER ORDERED** that the **Motions for Oral Argument (Docs. 36 and 40)** are **DENED**.

Baton Rouge, Louisiana, this 18th day of June, 2018.

_____
**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**